PROTAS *v.* MODERN INVESTMENT CORPORATION.

4-5478                                    128 S. W. 2d 360

Opinion delivered May 15, 1939.

*R. S. Wilson*, for appellant.

*Hardin & Barton, Rittenhouse, Webster & Rittenhouse* and *Paul E. Gutensohn*, for appellees.

GRIFFIN SMITH, C. J. Appellants alleged an oral contract of fire insurance. This appeal is from actions of the chancellor in finding that the allegations were not established, and in dismissing for want of equity.

The London Assurance, United States Branch, through its agency at Oklahoma City, issued a $2,000 policy indemnifying appellants against loss on furniture, fixtures, and motion picture projecting machines at Spiro, Oklahoma. The policy was dated November 26, 1937, with a December 17 endorsement. As originally written, the insured were listed as J. L. Protas and Frank Comber. Under the endorsement, Comber was substituted as the insured in lieu of Comber and Protas.

Protas was in the mercantile business in Fort Smith and had been so engaged, as he testified, for about ten years. During that period C. W. Jameson, manager of

Modern Investment Corporation of Fort Smith, had been writing insurance on Protas' Fort Smith business.

Protas was asked if Jameson had been representing him as an insurance agent, and replied that he had. Protas contended that from November 26, when the Spiro property was insured, there were conversations respecting the policy, resulting in corrections. About January 9, 1938, the coverage clauses were examined and certain irregularities were noted. The policy was retained by Jameson, who subsequently sent it to the agency at Oklahoma City.

Protas testified that at the time the policy was being examined, and when conversations were had relating to the inaccuracies, he and Comber owned a picture show at Webbers Falls, Oklahoma.—"At that time we told Mr. Jameson to insure Webbers Falls because the equipment was in, and as we had told him before it would be ready. When Mr. Jameson was leaving he said, 'You want this [Webbers Falls policy] just like [the Spiro] policy'? [and I said], 'Yes, except $1,000 more, because we have new and more expensive machinery at Webbers Falls'— and that was good night."

"Q. When you told him you wanted the insurance on the Webbers Falls equipment, what did he say? A. He said, 'Boys, you are covered' ".

Fire destroyed the Webbers Falls equipment January 19. Protas says he notified Jameson the day of the fire.—"Mr. Jameson came up to my place of business: 'Mr. Jameson,' I said, 'how are the policies'? 'O, everything's all right,' [he replied]. I questioned him again about the Webbers Falls policy, and he said, 'You are covered.' I [then said], 'Well, the darned place is burned down,' and he said, 'Well, make out your list of equipment.' It took up that day and part of the night to look up the bills. The next day Mr. Comber and I delivered to Mr. Jameson at the Ward Hotel building an itemized statement of the equipment that was burned . . . This is a copy. Mr. Jameson called me in an hour or so and said, 'Protas, you have some things like "stage" that doesn't belong to the equipment. I believe

that if you will take this off it won't be complicated with the insurance company.' I assumed he was right. Jameson came out to my place of business two or three times; in fact, we paid him a balance on the Spiro policy, as well as I believe, on Mr. Comber's automobile . . . He said, 'You are covered; you have nothing to worry about'. We didn't worry about it until about six weeks, and then we began looking for some one to give us advice. . . . We demanded adjustment of the loss, and Mr. Jameson would say, 'Well, still nothing from main headquarters' —that he hadn't heard from them, or something like that.''

On cross-examination Protas stated that Frank Comber was his brother-in-law; that at the time of trial his son, A. J. Protas, was owner of the Spiro property; that on December 17, 1937, witness and Comber each owned a half interest in the Spiro business, but on December 17 he had R. M. Langston, the Oklahoma agent, put an indorsement on the policy showing Comber to be the owner; that to the best of his recollection the Webbers Falls property was acquired about the first of November; that his interest was that of a lessor.

Substance of other testimony offered by plaintiffs was that Comber and Protas informed Jameson they would like to have insurance on the Webbers Falls property, and that Jameson replied, "All right, you are covered." Jameson was asked to "Please take care of this."

The complaint alleged the oral contract of insurance was entered into November 26, which was the same day the policy on the Spiro property was dated.

C. W. Jameson testified he was manager of Modern Investment Corporation, residing in Fort Smith; that neither he nor his company had at any time represented The London Assurance; that he was not authorized to do business in the State of Oklahoma, nor was Modern Investment Corporation; that appellant Protas has business interests in Fort Smith, and he (Jameson) had written insurance for Protas for a number of years; that he first heard of the motion picture business at Spiro in December, 1936, "when Mr. Protas told me about owning

the property. He stated that he did not have insurance, and would like to get it. I told him I couldn't write insurance on property in Oklahoma, but that I had a friend in Oklahoma City I could contact, and that I could get the policy issued through this friend of mine—Mr. Harris, State agent for The London Assurance."

The witness testified that he wrote Harris; that Harris was unable to get the Spiro rate, because it had not been established by the bureau; that he (Jameson) had several conversations with Protas, but that Harris could not get the Oklahoma bureau to rate Spiro. The matter was dropped, but in October, 1937, Protas and Comber called on witness at his office. While there, something was said about the Spiro property. Witness told Protas and Comber he would again try to get a rate. At the same time Protas and Comber said they were on a deal for a picture show at Webbers Falls, and that they would want insurance there.

Witness says he told his callers to let him know when they were ready. In the meantime, he wrote Harris, reopening the case, stating that $2,000 in insurance was wanted on the Spiro property.—"We were unable to get a rate on Spiro for some little time. In November Mr. Harris wrote me and told me that the only way it looked like they could get the bureau to rate this property was to write a policy on it. So this policy on the Spiro property was written, effective November 26, 1937. When I took this policy to Mr. Comber it was written at a $2.50 rate, which made the premium $50. Mr. Comber said he wouldn't pay any such premium as that.

"I tried to explain that in the event the premium was lower when the final rate was established, there would be a return premium due him. He told me to ascertain what that would be, and then he would talk business with me. That was along about the first of December. At the same time they told me about an error in the coverage, and we sat there and discussed it. They also told me they had leased the Webbers Falls property and were going to want some insurance. I told them I would get them the rate on it. . . . As I remember, they hadn't gotten

possession of the property at that time—or just had gotten possession: they hadn't done any work on it. [Without returning the Spiro policy] I wrote and told Mr. Harris of the refusal to pay the rate, and that I would like to get the flat rate cancellation period extended because I didn't want to be 'stuck' on the premium. He wrote back and told me the bureau was working on the rate and he would allow flat cancellation on the policy in the event it wasn't accepted. A little later in December— the 16th, I believe it was—I was out at the store. . . . I had the Spiro policy in my possession. . . . I offered it to them, but they were still haggling over the premium.

"Mr. Protas had a small loss on a dwelling house. This was January 19. After I got there he asked me about this insurance on the Webbers Falls property and I told him I hadn't received a rate on it yet. He wanted to know if he was covered, and I told him, 'No, you aren't covered; I haven't been able to get a rate on it yet.' He said, 'I am awfully sorry; we thought we were going to get that insurance issued, and we had a fire last night, and it burned.' I told him if I could assist him in any way I would be glad to do that, but that I had not bound the company; I couldn't bind the company. I hadn't had any authorization either as to the amount or the time for the insurance to start. I had no notice of any equipment ever being placed in the building, so I didn't feel like he had anything to insure, or he would have notified me if he had."

According to Jameson, final adjustment of the Spiro rate was had in February, and the policy was delivered. Jameson insisted that when he talked with appellants December 16 about insuring the Webbers Falls property, seats he thought were samples of those to be installed in the Webbers Falls theatre were in Protas' store. Witness denied stating that the property would be "covered"; but, to the contrary, insisted that he said, "When the time comes I will take care of it."

It was shown that the Spiro policy bore the indorsement: "Modern Investment Corporation. Insurance, Real

Estate. C. W. Jameson, manager, Fort Smith, Arkansas." In explanation of the indorsement, Jameson testified—"Well, you see, the policy wasn't paid for. If a man has a policy in his files, he should at least know who he was. . . . They owed me for this policy; it had never been paid for."

Testifying further, Jameson said: "After the fire Mr. Protas and Mr. Comber asked me what to do, and I said, 'The first thing you ought to do is to find out what your loss is—you had better get your bills together and find out where you are, and if I can be of any assistance, I shall be glad to do so. . . . They were hoping they would be able to collect from the insurance company. . . . The reason I went out to his house was that I had a $17.50 check from another insurance company for him. I delivered it to him, and he told me about the fire. . . . The first payment on the Spiro policy was in April, 1938—$10. Another ten-dollar payment was made in May, and the balance of $13.20 was settled in June. The rate had been adjusted to $33.20.

Appellants contend (a) that subject-matter of the claimed Webbers Falls insurance was not in existence, or at least the property had not been placed at the time Jameson is said to have agreed upon the coverage; (b) that Jameson was representing Protas and Comber as their agent in procuring at their request insurance in a foreign state, if in fact there was a contract; (c) that service of summons on the Commissioner of Insurance for Arkansas did not give jurisdiction to the Arkansas court in a cause of action originating in Oklahoma, under a policy alleged to have been written in Oklahoma on property located in that state; (d) that the statutes of Oklahoma prohibit foreign insurance agents writing insurance in that state, and (e) the purported oral contract was not, in fact, made.

*First.* The London Assurance, without waiving any of its rights, moved to have the summons quashed. We think the motion should have been sustained. The contract sued on, even if we accept appellants' views of the transactions, was made in Oklahoma, and was to have been

performed there. The defendant could not be brought into an Arkansas court in the manner attempted.

*Old Wayne Mutual Life Association of Indianapolis v. McDonough*, 204 U. S. 8, 27 S. Ct. 236, 51 L. Ed. 345, was an action in an Indiana court against the plaintiff in error upon a judgment against it in a Pennsylvania court. The defendants in error brought suit against the insurance company (an Indiana corporation) in Pennsylvania, upon a certificate of life insurance, whereby the insurance company agreed to pay Winnifred Herrity and Sarah McDonough, of Scranton, Pennsylvania, or their legal representatives, the sum of $5,000, etc., the policy or certificate having been on the life of Patrick McNally. Death of the insured having occurred, suit was prosecuted under jurisdiction alleged to have been acquired through summons served on the Insurance Commissioner for Pennsylvania. The insurance company, after its demurrer had been overruled, answered, alleging its status as an Indiana corporation; denying that it had ever been admitted to do business in Pennsylvania; that no one of its agents or officers was in that Commonwealth at the date of the alleged suit, or had been there since; that no summons was served upon it, and that it did not appear in that action; that no one appeared for it in Pennsylvania who had authority to do so.

There was judgment by default, and an effort to collect in Indiana. Plaintiff in error insisted that the Pennsylvania court had no jurisdiction, and consequently the judgment was void for want of the due process of law required by the Fourteenth Amendment. In disposing of the case, the court said:

"As the suit in the Pennsylvania court was upon a contract executed in Indiana; as the personal judgment in that court against the Indiana corporation was only upon notice to the Insurance Commissioner, without any legal notice to the defendant association and without it having appeared in person, or by attorney or by agent in the suit; and as the act of the Pennsylvania court in rendering the judgment must be deemed that of the State within the meaning of the Fourteenth Amendment, we

hold that the judgment in Pennsylvania was not entitled to the faith and credit which by the Constitution is required to be given to the public acts, records and judicial proceedings of the several States, and was void as wanting in due process of law."

*Simon* v. *Southern Railway Company*, 236 U. S. 115, 35 S. Ct. 255, 59 L. Ed. 492, is in point. The Louisiana statute required foreign corporations doing business within the State to name an agent for service, and further provided that upon failure so to do, process served upon the Secretary of State would have the same effect as though the corporation had been served personally. It was alleged that the appellant had fraudulently obtained a judgment against the Southern Railway; that the Company had no notice the suit had been brought. There was judgment by default. Upon ascertaining that judgment had been rendered, the Company filed in the United States Circuit Court for the District of Louisiana a bill against Simon, a citizen of Louisiana, asking that he be perpetually enjoined from enforcing the judgment. The opinion by the Supreme Court of the United States says:

"Subject to exceptions, not material here, every State has the undoubted right to provide for service of process upon any foreign corporation doing business therein; to require such companies to name agents upon whom service may be made; and also to provide that in case of the company's failure to appoint such agent, service, in proper cases, may be had upon an officer designated by law. . . . But this power to designate by statute the officer upon whom service in suits against foreign corporations may be made relates to business and transactions within the jurisdiction of the State enacting the law. Otherwise, claims on contracts wherever made and suits for torts wherever committed might by virtue of such compulsory statute be drawn to the jurisdiction of any State in which the foreign corporation might at any time be carrying on business. The manifest inconvenience and hardship arising from such extra-territorial extension of jurisdiction, by virtue of the power to make such compulsory appointment, could

not defeat the power if in law it could be rightfully exerted. But these possible inconveniences serve to emphasize the importance of the principle laid down in *Old Wayne Life Association* v. *McDonough, supra*, that statutory consent of a foreign corporation to be sued does not extend to causes of action arising in other States.''

In *National Liberty Insurance Company* v. *Trattner*, 173 Ark. 480, 292 S. W. 677, the appellee had brought suit in Craighead Circuit Court to recover $12,000 under a fire insurance policy. The goods and fixtures, at the time the policy was issued and the loss incurred, were contained in a building in St. Louis, State of Missouri. The plaintiff was a citizen of St. Louis. Summons was served on the Insurance Commissioner for Arkansas. The defendant, a foreign corporation, had been authorized to do business in this State. It appeared for the sole purpose of moving to quash summons. Judgment was for the plaintiff.

The opinion was written by Mr. Justice Kirby. He quoted § XI, art. 12, of our Constitution,[1] and then said:

''A fair construction of our law under the provisions of which foreign corporations are authorized to do business in the State upon the appointment of an agent upon whom process can be served, made primarily to secure local jurisdiction in respect of contracts made and business done within the State, would seem to require only that such corporations shall be subject to suit for any liability arising from or growing out of contracts made or business done in the State or necessarily incident thereto, and not that they shall be required by service

---

[1] "Foreign corporations may be authorized to do business in this state under such limitations and restrictions as may be prescribed by law. Provided, that no such corporation shall do any business in this state except while it maintains therein one or more known places of business and an authorized agent or agents in the same upon whom process may be served; and, as to contracts made or business done in this state, they shall be subject to the same regulations, limitations and liabilities as like corporations of this state, and shall exercise no other or greater powers, privileges or franchises than may be exercised by like corporations of this state, nor shall they have power to condemn or appropriate private property."

of summons upon said agent to be subject to suits of non-residents of the State upon foreign causes of action, transactions, and causes of actions arising outside the State and in no wise incident, related to, or connected with contracts made or business done in the State. The Legislature . . . is presumed to intend that its statutes shall not apply to acts or contracts done or effected beyond the limits of the State, and having no reference to or effect upon persons or property in the State.''

The difference between the suit at bar and the Trattner Case is that Protas and Comber are residents of Arkansas, while Trattner was not. The principle, however, is not affected by that circumstance. The subject-matter of the instant suit (if in fact it existed within legal contemplation at the time the conversations upon which coverage is predicated. are alleged to have occurred) was in Oklahoma. In writing the Spiro policy, the London Assurance acted through its agent at Oklahoma City. Jameson was not authorized to write insurance in Oklahoma, nor did he represent The London Assurance in a manner creating the relationship of principal and agent. It is probable that, as a friend of appellants, and as one who had handled their insurance business for ten years, Jameson undertook, after being informed of the fire, to be of service to his clients. He had written Harris that a policy at Webbers Falls was wanted. He did not know what the company's attitude would be with respect to the claim, and suggested to appellants that they make proof. This was not inconsistent with his previous relationships, although he seems to have impliedly expressed a degree of optimism not warranted by the facts, and to that extent he possibly misled his clients. If this conduct be conceded, still there was no ratification. Not being an agent of The London Assurance, no unauthorized act of his could amount to ratification.

Nor can Modern Investment Corporation be held liable. A preponderance of the evidence establishes the fact that Protas and Comber knew negotiations for the Spiro policy were being carried on with the Oklahoma

City agency, and according to their own testimony the Webbers Falls policy was to be similar, except as to amount.

Having reached the conclusion that as to the appellee The London Assurance there was no proper service; and further, that there was no oral contract of insurance; and having determined that there was never an intention that the alleged policy should be written by Modern Investment Corporation, it follows that the judgment must be affirmed. It is so ordered.

HOLT, J., disqualified and not participating.